**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

WINNIFRED BELL; ALLURA
LIGHTFOOT; and DEANNA WALLER,

    Plaintiffs,

vs.                                            Case No. 6:12-cv-1560-Orl-37GJK

CITY OF WINTER PARK, FLORIDA;
CITY OF WINTER PARK, FLORIDA,
CITY COUNCIL; STEVEN LEARY;
CAROLYN COOPER; TOM
MCMACKEN; SARAH SPRINKEL; and
BRETT C. RAILEY,

    Defendants.

**ORDER**

This cause is before the Court on the following:

1.     Plaintiffs' Verified Complaint (Doc. 1), filed October 16, 2012;

2.     Plaintiffs' Motion for Temporary Restraining Order (Doc. 2), filed October 16, 2012;

3.     Plaintiffs' Motion to Waive Posting a Bond to Obtain a Temporary Restraining Order (Doc. 3), filed October 16, 2012;

4.     Order Denying Motion for Temporary Restraining Order and Converting It to Motion for Preliminary Injunction (Doc. 6), filed October 18, 2012;

5.     Defendants' Consolidated Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction (Doc. 15), filed November 7, 2012;

6.     Defendants' Motion to Dismiss Verified Complaint with Prejudice and Memorandum of Law in Support (Doc. 22), filed November 14, 2012;

7. Plaintiffs' Reply Supporting Plaintiffs' Motion for Temporary Restraining Order as Converted to Motion for Preliminary Injunction (Doc. 23), filed November 14, 2012;

8. Plaintiffs' Opposition to Defendants' Motion to Dismiss (Doc. 26), filed November 24, 2012;

9. Hearing on Motion for Preliminary Injunction (Doc. 27, Minutes), held December 10, 2012; and

10. Plaintiffs' Consent Motion for Leave to File First Amended Complaint (Doc. 40).

Upon consideration, the Court hereby denies Plaintiffs' motion for preliminary injunction and grants Defendants' motion to dismiss, for the reasons set forth below.

## BACKGROUND[1]

On August 18, 2012, Jenna Tosh, the President and CEO of Orlando Planned Parenthood, returned to her home in Winter Park after taking a walk with her husband and young son. (Doc. 16, Tosh Aff., ¶ 2.) Thirty anti-abortion protesters were lined up on the sidewalk in front of her home, carrying large signs bearing Tosh's name, phrases like "baby killer," and graphic images. (*Id.* ¶¶ 2–3.) The protesters were shouting Tosh's name, chanting, and singing. (*Id.* ¶ 3.) They were standing closely together on the sidewalk, and Tosh had to ask them to move aside so that she and her family could enter their home. (*Id.*) She could still hear the protest once inside her home. (*Id.*) One of Tosh's neighbors called the police, who came but did not direct the protesters to leave.

---

[1] The factual findings and conclusions of law in this Order are not controlling for any later purposes, including a permanent injunction or trial. *E. Remy Martin & Co. v. Shaw-Ross Int'l Imps.*, 756 F.2d 1525, 1528 n.1 (11th Cir. 1985).

(*Id.*) The protest continued for about an hour and a half and then ended when it began to rain. (*Id.*)

After the protest, Tosh contacted the police, the City Commission, and City Commissioner Sarah Sprinkel because she was afraid for her family's safety. (*Id.* ¶ 4.) The City Commission held a meeting on August 27, 2012, at which Tosh recounted her experience. (*Id.* ¶ 5.) The Commission moved to enact an emergency picketing ordinance[2] to address Tosh's situation. (Doc. 16, City Commission Meeting Minutes of August 27, 2012, p. 31.) The City's Mayor noted his concern about the "threatening" nature of the picket. (*Id.* at 33.) The Commission unanimously adopted the emergency ordinance on a 5-0 vote, with the Mayor and the four Commissioners all in favor. (*Id.*)

On September 24, 2012, the Commission moved to enact a permanent version of the earlier emergency ordinance. (Doc. 16, City Commission Meeting Minutes of September 24, 2012, p. 46.) Citizens from the community spoke about the ordinance (eleven against; twelve in favor). (*Id.* at 47.) The Commission adopted the ordinance on a 4-1 vote, with the Commissioners in favor and the Mayor against. (*Id.*) In pertinent part, the ordinance reads:

> The terms "picket", "picketing" and "protest" shall all mean . . . any assembly of one or more persons, who, through conduct, speech or other form of expression, criticize, protest or complain about any matter in which a particular person, group of persons or type of person is specifically targeted for protest, complaint or criticism, and where such assembly stands, loiters, congregates or mills before or about a dwelling unit in which a person who is a target or subject of such protest resides or is perceived to reside. . . .
>
> It shall be unlawful for any person or persons to picket, protest or conduct any picketing or protesting activity within a buffer area of 50 feet from the property line of any dwelling unit in the City of Winter Park.

---

[2] Emergency ordinances are automatically repealed sixty-one days after enactment. (Doc. 16, City Commission Meeting Minutes of August 27, 2012, p. 31.)

3

(Doc. 16, Ordinance No. 2886-12, pp. 11–12.)

Plaintiffs Winnifred Bell, Allura Lightfoot, and Deanna Waller are "sidewalk counselors" who "share[] their religious, political, and social speech with people in the City." (Doc. 2, p. 5.) On October 16, 2012, they filed the Verified Complaint (Doc. 1) against Defendants—the City of Winter Park, the City Commission,[3] the four City Commissioners in their official capacities, and the Chief of Police in his official capacity. The Verified Complaint alleges that the ordinance is unconstitutional on its face and violates: (1) freedom of speech; (2) free exercise of religion; and (3) equal protection of the law. (*Id.* ¶¶ 58, 69, 85.) Plaintiffs also seek injunctive and declaratory relief. (*Id.* ¶¶ 92–105.)

Along with the Verified Complaint, Plaintiffs simultaneously filed a motion for a temporary restraining order (TRO) (Doc. 2), as well as a motion to waive the bond for obtaining a TRO (Doc. 3). The Court denied the TRO due to Plaintiffs' failure to establish the requisite imminence of injury necessary to overcome the lack of notice to Defendants. (Doc. 6.) The Court then converted the TRO into a motion for preliminary injunction and took it under advisement. (*Id.* at 3.) Defendants responded to the converted preliminary injunction motion (Doc. 15) and Plaintiffs replied (Doc. 23). Defendants subsequently filed a motion to dismiss the Verified Complaint (Doc. 22), to which Plaintiffs responded (Doc. 26). The Court held a hearing on the injunction on December 10, 2012. (Doc. 27.) This matter is now ripe for the Court's adjudication.

---

[3] Though the Verified Complaint names the Defendants as the "City Council" and its "Councilmembers" (Doc. 1, p. 1), it appears that the correct terminology is the "City Commission" and its "Commissioners" (Doc. 22, p. 7). Therefore, the Court will use the latter terms throughout this Order.

**STANDARDS**

I.   **Motion for Preliminary Injunction**

The Court is authorized to enter a preliminary injunction by Federal Rule of Civil Procedure 65. To prevail on their request for injunctive relief, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not issued; (3) that the threatened injury to Plaintiffs outweighs the potential damage that the proposed injunction may cause Defendants; and (4) that the injunction, if issued, will not be adverse to the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1240 (11th Cir. 2005). The Court may consider "affidavits and hearsay materials which would not be admissible evidence for a permanent injunction." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

Plaintiffs bear the burden of clearly establishing the four requirements to obtain an injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). The granting of a preliminary injunction is "an extraordinary and drastic remedy" and "the exception rather than the rule." *Id.* (citations and internal quotation marks omitted).

II.  **Motion to Dismiss**

Federal Rule of Civil Procedure 8(a)(2) provides that a claimant must plead "a short and plain statement of the claim." On a motion to dismiss, the Court limits its consideration to "the well-pleaded factual allegations." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). The factual allegations in the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this plausibility determination, the Court must accept the factual allegations as true; however, this "tenet . . . is inapplicable to legal conclusions."

5

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A pleading that offers mere "labels and conclusions" is therefore insufficient. *Twombly*, 550 U.S. at 555.

## DISCUSSION

**I.     Claims Against City Commission, Commissioners, and Police Chief**

As an initial matter, Defendants argue that the claims against the City Commission, as well as those against the Commissioners and the Police Chief in their official capacities, should be dismissed. (Doc. 22, pp. 7–8.) "[S]uits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent . . . . To keep both the City and the officers sued in their official capacity as defendants . . . [is] redundant." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citations omitted); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) (noting that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"). Thus, Plaintiffs' claims against the Commissioners and the Police Chief in their official capacities are essentially the same as those against the City. Accordingly, the claims against the Commissioners and the Police Chief are due to be dismissed as duplicative.

As to the City Commission, city councils are not legal entities subject to suit. *Fairbanks v. City of Bradenton Beach*, 733 F. Supp. 1447, 1450 (M.D. Fla. 1989) (finding that a city council was "not a legal entity capable of being sued"); *cf. Bonilla v. City Council of Chicago*, 809 F. Supp. 590, 600–01 (N.D. Ill. 1992); *Latino Political Action Comm., Inc. v. City of Boston*, 581 F. Supp. 478, 484 (D.C. Mass. 1984). Therefore, the claims against the City Commission are also due to be dismissed.[4]

---

[4] Even if the City Commission was an entity capable of being sued, a suit against the Commission as an arm of the City is redundant because the City is also sued;

## II.  Claims Against City of Winter Park

The Court now turns to the gravamen of Plaintiffs' complaint: that the City's ordinance, on its face, violates Plaintiffs' constitutional rights. The first factor in determining whether a preliminary injunction should issue is whether Plaintiffs are likely to prevail on the merits of their facial challenge. As set forth below, the Court finds that Plaintiffs have not presently demonstrated a substantial likelihood of success on their claims; thus, the Court must deny their motion for a preliminary injunction.

### A.  Free Speech[5]

"[T]he appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Though Plaintiffs' counsel attempted to classify the ordinance as content-based[6] in oral argument, the Court begins with the threshold determination that the ordinance is

---

therefore, it would be dismissed as duplicative for the reasons discussed above.

[5] Plaintiffs make their claims under both the U.S. and Florida Constitutions. (Doc. 1, ¶ 59.) As the Florida Supreme Court has held the freedom of speech provision in Article I, Section 4 of the Florida Constitution to be of the same scope as the First Amendment, the Court will focus on First Amendment jurisprudence only. *See Dep't of Educ. v. Lewis*, 416 So. 2d 455, 461 (Fla. 1982).

[6] Counsel focused on the fact that the ordinance includes both the words "picket" and "protest." However, he was unable to distinguish the controlling Supreme Court precedent on that issue, which held that simply because a statute uses the word "protest" does not mean it becomes content-based—rather, the relevant inquiry is whether it prohibits "a particular viewpoint or . . . subject matter." *Hill v. Colorado*, 530 U.S. 703, 723–24 (2000). Because the instant ordinance is viewpoint-neutral—it would

content-neutral. The City's stated purpose for passing the ordinance is "the harmony, peace and tranquility of persons residing in residential dwelling units in the City of Winter Park," and to protect those residents' right to "feel free" and "safe" in their homes. (Doc. 16, Ordinance No. 2886-12, p. 12.) The ordinance does not prohibit any particular speech content, such as "anti-abortion" or "religious" speech. Indeed, the City's purpose is virtually identical to the purpose of an ordinance found by the U.S. Supreme Court to be content-neutral. *Compare Frisby*, 487 U.S. at 477 ("[T]he primary purpose of this ban [is] the protection and preservation of the home through assurance that members of the community enjoy in their homes and dwellings a feeling of well-being, tranquility, and privacy." (internal quotation marks omitted)), *with* (Doc. 16, Ordinance No. 2886-12, p. 9 ("[T]he primary purposes [of the ordinance are] protecting and preserving the homes in Winter Park and . . . provid[ing] for the members of the community who reside in such single family homes and dwellings a feeling of well-being, tranquility and privacy.")). The ordinance is therefore content-neutral.[7]

Where a law is content-neutral, it must: (1) serve a significant government interest; (2) be a narrowly tailored means of achieving that interest; and (3) provide for ample alternative avenues of expression. *Perry Educ. Ass'n v. Perry Local Educators'*

---

equally apply to both anti-abortion protests and pro-choice protests, for instance—*Hill* forecloses the argument that it is content-based.

While Plaintiffs cited to a U.S. Court of Appeals for the Eleventh Circuit opinion which found the word "protest" to be content-based, that holding was based on the particular definition of "protest" in the statute, which was specifically directed to "political or other cause[s]." *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1250 (11th Cir. 2004) ("[T]he County's definition of 'Protest/Demonstration[]' . . . expressly targets all expression on a certain subject matter, political speech."). As that is not the case here, *Burk* is inapposite.

[7] Plaintiffs' briefing implicitly concedes this point by arguing in terms of "narrow tailoring," which is the content-neutral standard (as opposed to "least restrictive means," the content-based standard). (Doc. 2, p. 13.)

8

*Ass'n*, 460 U.S. 37, 45 (1983). "Narrowly tailored" does not mean that the law has to be the least restrictive means of achieving the government interest. *Ward*, 491 U.S. at 798–800. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Id.* at 800 (citation and internal quotation marks omitted) (alteration in original).

### 1. Alternative Avenues

Plaintiffs insist that the ordinance "completely bans all residential picketing." (Doc. 2, p. 13.) That is a tortuous misreading of the plain language of the law. This Court begins its analysis by specifically finding that this ordinance does not ban all residential picketing in the City of Winter Park, for the reasons set forth below.

In *Frisby v. Schultz*, the controlling precedent on this issue, the U.S. Supreme Court upheld an ordinance which read: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield." 487 U.S. at 477. Unlike in the instant case, the *Frisby* ordinance contained no "definitions" section narrowing or even stating the precise scope of the ban. *Id.* at 482. The Court therefore relied on the "well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Id.* at 483. The Court used this principle to construe the words "residence" and "dwelling" to suggest that "the ordinance is intended to prohibit only picketing focused on, and taking place in front of, a particular residence." *Id.* at 482. The Court found that the district court's broader construction of the ordinance

as one banning "all picketing in residential areas" was plain error.[8] *Id.* at 482–83. With this narrow reading, the Court found that it was "virtually self-evident that ample alternatives" for protesting were available. *Id.* at 483.

If it was plain error for the lower courts in *Frisby* to construe that language to ban all residential picketing, it would be even more misguided for this Court to find that the instant ordinance constitutes a complete ban on residential picketing. The *Frisby* Court had to construe that ordinance to apply only to targeted picketing, but this ordinance explicitly does so—no construction is necessary. (Doc. 16, Ordinance No. 2886-12, p. 10 ("[T]he City Commission seeks to prevent picketing that is targeted against specific residents.").) Protesters may still enter residential neighborhoods in the City, "alone or in groups, even marching . . . . They may go door-to-door to proselytize their views. They may distribute literature." *Frisby*, 487 U.S. at 484 (citation and internal quotation marks omitted). They may camp out and form a picket line fifty-one feet away from the targeted residence, or down the street. (Doc. 15, p. 10.) They may parade through the neighborhood and past the targeted residence inside the fifty-foot buffer zone, so long as they do not loiter. (*Id.*) If all that is not enough, they may apply to the City Manager for even more space to protest abutting a residential zone,[9] which the City Manager must grant.[10] (Doc. 16, Ordinance No. 2886-12, p. 13.) Thus, there are ample alternative avenues for communication.

---

[8] Indeed, the *Frisby* Court found that it was plainly erroneous to construe the ordinance so broadly even in view of the fact that the Town itself "repeatedly refer[red] to the ordinance as banning all picketing in residential areas [in its briefing]." 487 U.S. at 490 (White, J., concurring).

[9] Of course, the protesters may also always protest in a commercial zone (Doc. 16, Ordinance No. 2886-12, p. 13), such as outside Planned Parenthood itself.

[10] Plaintiffs argue that this section of the ordinance creates a permitting scheme that confers unfettered discretion on City officials. (Doc. 2, pp. 18–19.) As discussed

### 2. Significant Interest

"The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey v. Brown*, 447 U.S. 455, 471 (1980). As the City's stated interest is the protection of residents' well-being, tranquility, and privacy (Doc. 16, Ordinance No. 2886-12, p. 9), the ordinance serves a significant government interest.[11] *See Frisby*, 487 U.S. at 484 (finding "the protection of residential privacy" to be a significant government interest).

### 3. Narrowly Tailored

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Id.* at 485. Plaintiffs devote most of their argument[12] to advancing the theory that this ordinance is less narrowly tailored than the

---

above, however, the permit provision is both non-discretionary and only one of multiple avenues of communication. (*See* Doc. 16, Ordinance No. 2886-12, p. 13 ("Alternative Means. The City Manager *shall* . . . make available City owned land reasonably near or abutting a residential zoning district for any protest or picket . . . ." (emphasis added)).)

Furthermore, *Burk v. Augusta-Richmond County*, 365 F.3d 1247 (11th Cir. 2004), on which Plaintiffs rely heavily, is misapplied to this permit provision. The ordinance in *Burk* only allowed political protests of groups of five or more with a permit, and the granting of the permit was vested completely in the sheriff's discretion. *Id.* at 1250. The instant ordinance allows for any type of protest of any number of people without a permit more than fifty feet away from the targeted residence, and the granting of a permit for additional space to protest is mandatory. (*See* Doc. 15, p. 10.) Thus, *Burk* is wholly inapt.

[11] Plaintiffs' counsel conceded as much at the hearing.

[12] In a related argument, Plaintiffs contend that the ordinance is also overly broad. (Doc. 2, p. 16.) A law is impermissibly overbroad if "it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). Though doctrinally distinct, overbreadth in this particular case is related to the narrow-tailoring inquiry. This Court finds that the ordinance is narrowly tailored because it is directed only at targeted protesting focused on a specific residence; the ordinance is not overly broad for the same reason—it is directed to the very particular harm caused by protesting within fifty feet of a private residence and forcing a message onto a captive, unwilling listener.

Justice John Paul Stevens dissented from the *Frisby* majority because he was concerned that the ordinance in that case could be overly broad. 487 U.S. at 496–99

one upheld in *Frisby*. (Doc. 2, pp. 13–16.) This Court simply cannot give credence to that argument.

In *Frisby*, the Supreme Court noted, "[W]e have repeatedly held that individuals are not required to welcome unwanted speech into their own homes." *Id.* at 484–85. The Court reasoned that, in order to protect "the unwilling listener" and the significant interest of residential privacy, governments were allowed to restrict targeted picketing, which was "fundamentally different" from other sorts of generally directed communications that could not be banned. *Id.* at 485–86. Focused picketing holds the target "captive" within the home; because "the unique and subtle impact of such picketing" leaves no place for the resident to escape, an ordinance's "complete ban of that particular medium of expression is narrowly tailored." *Id.* at 487–88.

This holding mandates a finding of narrow tailoring in the instant case. The ordinance at bar applies to protesters who "generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way." *Id.* at 486. Further, "even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy." *Id.* As the ordinance's scope—giving targeted residents

---

(Stevens, J., dissenting). Justice Stevens admitted that the ordinance had a plainly legitimate sweep—prohibiting protesters from holding the target's home "under a virtual siege"—but worried that its lack of precise definition could lead to a "ban against friendly, innocuous, or even brief unfriendly picketing." *Id.* However, that concern is allayed here because the instant ordinance protects those "specifically targeted for protest, complaint or criticism" (Doc. 16, Ordinance No. 2886-12, p. 11), and is only definitionally broad enough to encompass conduct "intended to cause [the subject and her family] substantial psychological distress." *Frisby*, 487 U.S. at 498 (Stevens, J., dissenting). Therefore, the ordinance does not prohibit a substantial amount of protected speech in relation to its plainly legitimate sweep, and it is not impermissibly overbroad.

a fifty-foot zone[13] in which to enjoy a modicum of privacy—precisely mirrors the particular evil to be remedied—intrusive conduct directed at a particular target—the ordinance is sufficiently narrowly tailored. *See id.* at 487–88.

As the ordinance meets all parts of the three-prong test, it passes constitutional muster and does not violate freedom of speech. Plaintiffs have therefore not demonstrated a likelihood of success on this claim.

### B.     Free Exercise[14]

While the majority of Plaintiffs' motion addresses their freedom of speech claim, Plaintiffs also argue that the ordinance violates their right to the free exercise of religion. (Doc. 2, pp. 2–3.) Laws that burden free exercise fall into two categories: (1) incidental burdens, where the law is neutral and generally applicable and simply happens to impact certain religious groups; and (2) purposeful burdens, where the law is an attempt by the government to purposely interfere with religious freedoms. *See Church of the*

---

[13] Plaintiffs' counsel argued at the hearing that eliminating the buffer zone would make the ordinance more narrowly tailored and bring it in line with *Frisby*. Plaintiffs also contend that the ordinance is vague for similar reasons. (Doc. 2, p. 17 n.1.) The Court cannot agree. Eliminating the buffer zone would be more restrictive and more confusing to the protesters, not less. The way the ordinance is drafted, picketers know exactly how close they can get to the targeted residence, unlike in *Frisby*, where the ban was simply on picketing "before or about" a residence. 487 U.S. at 477. The fact that this ordinance creates a specific, quantifiable buffer zone makes an even stronger case for its constitutionality than the ordinance approved in *Frisby*. *See also Thorburn v. Austin*, 231 F.3d 1114, 1116 (8th Cir. 2000) (upholding an ordinance prohibiting picketing in a fifty-foot buffer zone around a targeted residence).

[14] Plaintiffs make their claims under both the U.S. and Florida Constitutions. (Doc. 1, ¶ 70.) As the free exercise provision in Article I, Section 3 of the Florida Constitution provides either equal or less protection than the First Amendment, the Court will focus on First Amendment jurisprudence only. *See Bush v. Holmes*, 886 So. 2d 340, 365 (Fla. 1st DCA 2004) ("Florida courts have generally interpreted Florida's Free Exercise Clause as coequal to the federal clause."); *Warner v. City of Boca Raton*, 267 F.3d 1223, 1226 n.3 (11th Cir. 2001) ("[T]he very text of the [free exercise provision of the] Florida Constitution suggests that it affords less absolute protection than that provided by the United States Constitution.").

13

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–35 (1993). A law is neutral and generally applicable if neither its object nor its impact is the selective infringement of religiously motivated practices. *See id.* at 533, 542–43. "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. Rather, laws that are neutral and generally applicable are presumptively constitutional. *Id.*

While the ordinance may, in part, impact religious groups seeking to proselytize beliefs, such as the one to which Plaintiffs belong, it is not specifically directed at Christians or any other particular religious group: it applies to everyone. *See, e.g.*, *Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) (holding that the Freedom of Access to Clinic Entrances Act was neutral and generally applicable because it was directed towards everyone, despite the fact that it incidentally prevented anti-abortion protesters with "sincerely held religious belief[s] that abortion is murder" from physically obstructing abortion clinic entrances); *see also Am. Life League, Inc. v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995) (finding a law to be only an incidental burden not violative of the Free Exercise Clause because it "punishes conduct for the harm it causes, not because the conduct is religiously motivated"). The object of the ordinance is not to infringe on the free exercise of religion, and though it may impact religiously motivated protesters, it impacts all protesters the same. The object instead is the protection of the City's residents in their homes from intrusive conduct, no matter the religious beliefs (or lack thereof) of the protesters outside. Thus, the ordinance is neutral and generally

applicable and presumptively constitutional; Plaintiffs have done nothing to demonstrate otherwise. Therefore, the ordinance does not violate the Free Exercise Clause.[15]

In sum, Plaintiffs have not demonstrated a substantial likelihood of success on the merits of any of their claims that the ordinance is facially unconstitutional. Consequently, the Court need not address the other prongs of the preliminary injunction analysis. A preliminary injunction should not issue and Plaintiffs' motion is due to be denied.

Furthermore, as controlling Supreme Court precedent demonstrates that this ordinance is plainly constitutional on its face, Plaintiffs have not made out—indeed, could not make out—a plausible facial challenge. Though Plaintiffs have not been given a chance to amend their complaint, the Court finds that the addition of factual allegations would not change the result, as all relevant facts (namely, the ordinance itself) have already been alleged. The ordinance as written is constitutional on its face.[16] Accordingly, Defendants' motion to dismiss is due to be granted, and this case is dismissed with prejudice.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Plaintiffs' Motion for Temporary Restraining Order (Doc. 2), as converted

---

[15] Plaintiffs' third claim, that the ordinance violates the Equal Protection Clause of the Fourteenth Amendment, is solely premised on the alleged underlying First Amendment violations. (Doc. 1, ¶ 86.) As the Court has found that Plaintiffs have not made out any First Amendment violations, the Equal Protection claim also fails for those reasons discussed above.

[16] The Court notes, however, that nothing in this Order precludes a separate suit predicated on an as-applied challenge to the ordinance, if it is indeed applied in an unconstitutional manner. *See Frisby*, 487 U.S. at 488 ("[T]his case presents only a facial challenge to the ordinance. Particular hypothetical applications of the ordinance . . . may present somewhat different questions.").

      to a Motion for Preliminary Injunction (Doc. 6), is **DENIED**.

2. Plaintiffs' Motion to Waive Posting a Bond to Obtain a Temporary Restraining Order (Doc. 3) is **DENIED AS MOOT**.

3. Plaintiffs' Consent Motion for Leave to File First Amended Complaint (Doc. 40) is **DENIED AS MOOT**.[17]

4. Defendants' Motion to Dismiss Verified Complaint with Prejudice and Memorandum of Law in Support (Doc. 22) is **GRANTED**. This case is **DISMISSED WITH PREJUDICE**.

5. The Clerk is **DIRECTED** to close this case.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 6, 2013.

_____
ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record

---

[17] The proposed amended complaint is not substantively different than the Verified Complaint; Plaintiffs seek only to correct Defendant's name to "City Commission" rather than "City Council." (Doc. 40, p. 3.) As this Court has already gleaned the correct party name, *see supra* note 3, and the amended complaint would not add any substantive allegations, the motion is due to be denied as moot.